IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2014 Term

FILED

March 27, 2014

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 13-0037

WEST VIRGINIA REGIONAL JAIL AND
CORRECTIONAL FACILITY AUTHORITY,
an agency of the State of West Virginia,
Defendant Below, Petitioner

v.

A. B.,
Plaintiff Below, Respondent

Appeal from the Circuit Court of Kanawha County
The Honorable Carrie Webster, Judge
Civil Action No. 10-C-2131

REVERSED AND REMANDED

Submitted:  February 4, 2014
Filed:  March 27, 2014

M. Andrew Brison, Esq.                      Kerry A. Nessel, Esq.
Ryan L. Bostic, Esq.                        THE NESSEL LAW FIRM
Allen, Kopet, and Associates, PLLC          Huntington, West Virginia
Charleston, West Virginia                   Attorney for Respondent
Attorneys for Petitioner

JUSTICE WORKMAN delivered the Opinion of the Court.
CHIEF JUSTICE DAVIS dissents and reserves the right to file a dissenting opinion.

1.      "This Court reviews *de novo* the denial of a motion for summary judgment, where such a ruling is properly reviewable by this Court."  Syl. Pt. 1, *Findley v. State Farm Mut. Auto. Ins. Co.*, 213 W.Va. 80, 576 S.E.2d 807 (2002).

2.      "A circuit court's denial of summary judgment that is predicated on qualified immunity is an interlocutory ruling which is subject to immediate appeal under the 'collateral order' doctrine."  Syl. Pt. 2, *Robinson v. Pack*, 223 W. Va. 828, 679 S.E.2d 660 (2009).

3.      "The ultimate determination of whether qualified or statutory immunity bars a civil action is one of law for the court to determine.  Therefore, unless there is a bona fide dispute as to the foundational or historical facts that underlie the immunity determination, the ultimate questions of statutory or qualified immunity are ripe for summary disposition."  Syl. Pt. 1, *Hutchison v. City of Huntington*, 198 W. Va. 139, 479 S.E.2d 649 (1996).

4.      "In cases arising under W. Va. Code § 29-12-5, and in the absence of express provisions of the insurance contract to the contrary, the immunity of the State is coterminous with the qualified immunity of a public executive official whose acts or omissions give rise to the case.  However, on occasion, the State will be entitled to immunity when the official is not entitled to the same immunity; in others, the official

will be entitled to immunity when the State is not. The existence of the [] immunity of the State must be determined on a case-by-case basis." Syl. Pt. 9, *Parkulo v. W. Va. Bd. of Probation and Parole,* 199 W. Va. 161, 483 S.E.2d 507 (1996).

5.      "A public executive official who is acting within the scope of his authority and is not covered by the provisions of W. Va. Code 29-12A-1, *et seq.* [the West Virginia Governmental Tort Claims and Insurance Reform Act], is entitled to qualified immunity from personal liability for official acts if the involved conduct did not violate clearly established laws of which a reasonable official would have known. There is no immunity for an executive official whose acts are fraudulent, malicious, or otherwise oppressive." Syllabus, in part, *State v. Chase Securities, Inc.*, 188 W. Va. 356, 424 S.E.2d 591 (1992).

6.      "If a public officer is either authorized or required, in the exercise of his judgment and discretion, to make a decision and to perform acts in the making of that decision, and the decision and acts are within the scope of his duty, authority, and jurisdiction, he is not liable for negligence or other error in the making of that decision, at the suit of a private individual claiming to have been damaged thereby." Syl. Pt. 4, *Clark v. Dunn*, 195 W. Va. 272, 465 S.E.2d 374 (1995).

7.      "In the absence of an insurance contract waiving the defense, the doctrine of qualified or official immunity bars a claim of mere negligence against a State

agency not within the purview of the West Virginia Governmental Tort Claims and Insurance Reform Act, W. Va. Code § 29–12A–1, *et seq.*, and against an officer of that department acting within the scope of his or her employment, with respect to the discretionary judgments, decisions, and actions of the officer." Syl. Pt. 6, *Clark v. Dunn*, 195 W.Va. 272, 465 S.E.2d 374 (1995).

8. "Unless the applicable insurance policy otherwise expressly provides, a State agency or instrumentality, as an entity, is immune under common-law principles from tort liability in W. Va. Code § 29-12-5 actions for acts or omissions in the exercise of a legislative or judicial function and for the exercise of an administrative function involving the determination of fundamental governmental policy." Syl. Pt. 6, *Parkulo v. W. Va. Bd. of Probation and Parole,* 199 W. Va. 161, 483 S.E.2d 507 (1996).

9. "The common-law immunity of the State in suits brought under the authority of W. Va. Code § 29-12-5 (1996) with respect to judicial, legislative, and executive (or administrative) policy-making acts and omissions is absolute and extends to the judicial, legislative, and executive (or administrative) official when performing those functions." Syl. Pt. 7, *Parkulo v. W. Va. Bd. of Probation and Parole,* 199 W. Va. 161, 483 S.E.2d 507 (1996).

10. To determine whether the State, its agencies, officials, and/or employees are entitled to immunity, a reviewing court must first identify the nature of the

governmental acts or omissions which give rise to the suit for purposes of determining whether such acts or omissions constitute legislative, judicial, executive or administrative policy-making acts or involve otherwise discretionary governmental functions. To the extent that the cause of action arises from judicial, legislative, executive or administrative policy-making acts or omissions, both the State and the official involved are absolutely immune pursuant to Syl. Pt. 7 of *Parkulo v. W. Va. Bd. of Probation and Parole*, 199 W. Va. 161, 483 S.E.2d 507 (1996).

11. To the extent that governmental acts or omissions which give rise to a cause of action fall within the category of discretionary functions, a reviewing court must determine whether the plaintiff has demonstrated that such acts or omissions are in violation of clearly established statutory or constitutional rights or laws of which a reasonable person would have known or are otherwise fraudulent, malicious, or oppressive in accordance with *State v. Chase Securities, Inc.*, 188 W. Va. 356, 424 S.E.2d 591 (1992). In absence of such a showing, both the State and its officials or employees charged with such acts or omissions are immune from liability.

12. If the plaintiff identifies a clearly established right or law which has been violated by the acts or omissions of the State, its agencies, officials, or employees, or can otherwise identify fraudulent, malicious, or oppressive acts committed by such official or employee, the court must determine whether such acts or omissions were within the scope of the public official or employee's duties, authority, and/or

iv

employment. To the extent that such official or employee is determined to have been acting outside of the scope of his duties, authority, and/or employment, the State and/or its agencies are immune from liability, but the public employee or official is not entitled to immunity in accordance with *State v. Chase Securities, Inc.*, 188 W. Va. 356, 424 S.E.2d 591 (1992) and its progeny. If the public official or employee was acting within the scope of his duties, authority, and/or employment, the State and/or its agencies may be held liable for such acts or omissions under the doctrine of *respondeat superior* along with the public official or employee.

WORKMAN, Justice:

The West Virginia Regional Jail and Correctional Facility Authority (hereinafter "the WVRJCFA") appeals the December 3, 2012, order of the Circuit Court of Kanawha County denying its motion for summary judgment on qualified immunity grounds. The circuit court found that the WVRJCFA was not entitled to qualified immunity because 1) disputed issues of material fact precluded a determination as to whether the WVRJCFA is vicariously liable for the alleged sexual assaults committed by its employee; and 2) respondent's claims of negligent supervision, training, and retention do not encompass discretionary decisions in the administration of fundamental government policy. Upon careful review of the briefs, the appendix record, the arguments of the parties, and the applicable legal authority, we find that the WVRJCFA is entitled to qualified immunity; therefore, we reverse the order of the circuit court and remand the case for entry of an order granting summary judgment and dismissing the action against it.

## I. FACTS AND PROCEDURAL HISTORY

Respondent/plaintiff below, A. B. (hereinafter "respondent"), was convicted in 2006 of two counts of third degree sexual assault for having intercourse with her boyfriend's fourteen-year-old son; she was sentenced to one to five years for each count, to run consecutively. Respondent was paroled in August 2008, but violated her parole and was reconfined. She was booked into the Southern Regional Jail in

1

September, 2009. Respondent alleges that beginning in October, 2009 while housed at the Southern Regional Jail, she was vaginally and orally raped seventeen times by Correctional Officer D. H. (non-participant in this appeal),[1] who denies all allegations of sexual contact with respondent. Shortly after respondent claims the alleged sexual assaults commenced, on November 2, 2009, D. H. filed an incident report against respondent indicating that she had improperly propositioned him, asking if he would be willing to "trade a favor for a favor" in exchange for "anything."

On November 23, 2009, a fellow inmate in transit to a court hearing advised Sgt. Michael Francis and Correctional Officer Brian Ewing that respondent and others had assaulted her in the pod, resulting in a black eye; she further advised that respondent and Correctional Officer D. H. were having a sexual relationship. Sgt. Francis and C. O. Ewing each filed incident reports with their superior, Lt. Bunting. Lt. Bunting convened a meeting between Sgt. Francis, C. O. Ewing, and D. H., to advise D. H. of the allegations. C. O. Ewing testified in his deposition that D. H. responded to the allegations with "a snicker, you know, like, you know I can't believe that" and that Francis responded, "I knew when I heard it was your name, it wasn't you." No further investigation was conducted and respondent was never questioned about the allegations of sexual contact between her and D. H. It is undisputed that respondent never reported

---

[1] D. H. does not assert that he is entitled to qualified immunity.

2

any inappropriate conduct by D. H. Respondent remained at the Southern Regional Jail until April, 2010, when she was transferred to Lakin Correctional Center.

Respondent filed suit against D. H.[2] and the WVRJCFA alleging 1) violation of 42 U.S.C. §1983[3] and the West Virginia Governmental Tort Claims and Insurance Reform Act against D. H.; 2) intentional infliction of emotional distress against D. H.; 3) invasion of privacy against all defendants; 4) negligent hiring, retention, supervision, staffing, and training against the WVRJCFA; 5) a variety of common law intentional torts against D. H.; and 6) civil conspiracy between the defendants. The complaint expressly asserted that it was making no claims against the WVRJCFA under Section 1983 or for intentional infliction of emotional distress. During the pendency of the matter, respondent agreed to voluntarily dismiss her claims against the WVRJCFA

---

[2] Respondent also named a "John Doe" employee of the WVRJCFA, who "negligently allowed" the conduct of D. H. John Doe was dismissed by agreement of the parties.

[3] 42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

In short, "[t]o state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U. S. 42, 48 (1988).

3

for negligent hiring, invasion of privacy, violation of the Tort Claims Act, all West Virginia Constitutional violations, and any Section 1983 claims (which were expressly not pled in the complaint in the first instance), leaving only the negligent supervision, training, and retention "direct" claims against the WVRJCFA.[4]

At the close of discovery, the WVRJCFA moved for summary judgment on the basis of qualified immunity, arguing 1) that it could not be held vicariously liable for the intentional, illegal acts of its employee and respondent had not demonstrated a "clearly established" right which the WVRJCFA violated; and 2) respondent's negligence claims were barred because they involved the discretionary decisions involving the administration of a fundamental government policy. Respondent contended that 1) the WVRJCFA was vicariously liable for the acts of D. H. because the sexual assaults were within the scope of his employment; 2) the WVRJCFA, through its employee, violated West Virginia Code § 61-8B-10[5] and the federal Prison Rape Elimination Act of 2003;[6]

---

[4] Although not expressly dismissed, no further mention of the negligent staffing and civil conspiracy claims was made in the pleadings below. At a minimum, no evidence beyond mere allegations was adduced on these claims.

[5] West Virginia Code § 61-8B-10(a) provides, in pertinent part, that

> Any person employed by . . . a jail or by the Regional Jail and Correctional Facility Authority . . . who engages in sexual intercourse, sexual intrusion or sexual contact with a person who is incarcerated in this state is guilty of a felony and, upon conviction thereof, shall be confined in a state correctional facility under the control of the Commissioner of Corrections

(continued . . .)

and 3) the allegedly negligent acts of the WVRJCFA were neither "administrative" nor involved "fundamental governmental policy." The circuit court agreed with respondent and denied summary judgment. The circuit court's order specifically found that 1) disputed issues of material fact precluded a determination as to whether the WVRJCFA was vicariously liable for the alleged sexual assaults committed by its employee; and 2) respondent's claims of negligent supervision, training, and retention do not encompass "discretionary decisions in the administration of fundamental government policy." This appeal followed.

## II. STANDARD OF REVIEW

It is well-established that "[t]his Court reviews *de novo* the denial of a motion for summary judgment, where such a ruling is properly reviewable by this Court." Syl. Pt. 1, *Findley v. State Farm Mut. Auto. Ins. Co.*, 213 W.Va. 80, 576 S.E.2d 807 (2002). Moreover, "[a] circuit court's denial of summary judgment that is predicated on qualified immunity is an interlocutory ruling which is subject to immediate appeal under the 'collateral order' doctrine." Syl. Pt. 2, *Robinson v. Pack*, 223 W. Va. 828, 679 S.E.2d 660 (2009). This review, however, is guided by the following principle regarding qualified immunity:

---

for not less than one nor more than five years or fined not more than $5,000.

[6] 42 U.S.C. § 15601 *et seq.* (hereinafter "PREA").

> [t]he ultimate determination of whether qualified or statutory immunity bars a civil action is one of law for the court to determine. Therefore, unless there is a bona fide dispute as to the foundational or historical facts that underlie the immunity determination, the ultimate questions of statutory or qualified immunity are ripe for summary disposition.

Syl. Pt. 1, *Hutchison v. City of Huntington*, 198 W. Va. 139, 479 S.E.2d 649 (1996). With these standards in mind, we proceed to the parties' arguments.

## III. DISCUSSION

The WVRJCFA assigns as error the circuit court's determination that 1) the WVRJCFA is vicariously liable for the allegedly intentional, criminal acts of its employee, D. H.; and 2) employee supervision, training, and retention are not discretionary functions subject to immunity.

### A.

### *Immunity and the Vicarious Liability of the State and Its Agencies*

In the instant case, the WVRJCFA argues that it is not vicariously liable for the alleged acts of its employee, D. H., because the sexual assaults alleged herein were outside the scope of his duties as a correctional officer and therefore, it is entitled to immunity. Respondent, on the other hand, suggests that the following portion of Syllabus Point 9 of *Parkulo v. W. Va. Bd. of Probation and Parole,* 199 W. Va. 161, 483 S.E.2d 507 (1996), settles the issue: "[T]he immunity of the State is coterminous with the qualified immunity of a public executive official whose acts or omissions give rise to the case." Respondent contends, in essence, that this passage from *Parkulo* establishes a rote

6

*respondeat superior* liability for the State and its agencies since the State's immunity is "coterminous" with that of the public official whose acts give rise to the case. In other words, respondent contends that where the official has no immunity (as in the instant case), the State likewise has no immunity. Respondent argues, in the alternative, since the sexual assaults allegedly occurred while D. H. was on-duty and abetted by his position as a correctional officer, such acts were within the scope of his employment.

The circuit court, relying primarily on common-law master-servant principles, found that a jury question existed as to whether D. H. was acting within the scope of his employment. In so finding, the court relied on a case from the Eastern District of Virginia, *Heckenlaible v. Va. Peninsula Regional Jail Authority*, 491 F. Supp.2d 544 (E.D. Va. 2007), which held that because a correctional officer was required to look at an inmate unclothed while she showered, his employment put him a particular position to commit the alleged sexual assault; therefore, a jury could reasonably conclude that he was within the scope of his employment.[7]

### 1. The "Coterminous" Immunity of the State and its officials or employees

We begin our analysis by addressing respondent's position that Syllabus Point 9 of *Parkulo* stands for the proposition that where a State employee is not entitled

---

[7] However, we note that there was no discussion of the issue of qualified immunity in that case because Virginia *expressly* allows actions against the State for the negligence of its employees committed within the scope of their employment pursuant to its State Tort Claims Act. Va. Code Ann. § 8.01-195.3 (2007).

to qualified immunity, the State is likewise not immune. In point of fact, it is precisely the remainder of this syllabus point which militates squarely against respondent's position:

> . . . However, on occasion, the State will be entitled to immunity when the official is not entitled to the same immunity; in others, the official will be entitled to immunity when the State is not. The existence of the [] immunity of the State must be determined on a case-by-case basis.

Syl. Pt. 9, in part, *Parkulo*. *See also* Restatement (Second) of Torts § 895B cmt. h (1979) ("The existence of immunity on the part of the State or its agencies does not necessarily imply immunity on the part of its public officers, or vice versa."). In fact, *Parkulo* further specifically notes that "the vicarious liability of the State for its officer's conduct is not to be presumed merely from the absence of qualified immunity to protect the public executive official from personal liability for that conduct." 199 W. Va. at 177, 483 S.E.2d at 523. As such, it is clear in our jurisprudence that the immunity of the State and/or its agency is not necessarily circumscribed by the extent of the public official's immunity or lack thereof. The question which *Parkulo* and its progeny leave tantalizingly unanswered is what standards are to be utilized to determine the extent of the State's immunity, irrespective of that of its employee?[8] Simply relegating this

---

[8] The Court in *Parkulo* stated that "[b]ecause we do not have before us a factual situation requiring further development of this approach to the scope of qualified immunity for the governmental entities represented by public officials entitled to its benefit, we leave the full development of that approach to another day." *Id*. at 178, 483 S.E.2d at 524.

determination to a "case-by-case" basis without further guidance is particularly unedifying to both practitioners and the lower courts.

This appeal, in effect, presents this Court with an issue of first impression inasmuch as our existing caselaw provides little to no guidance on the scope and extent of the vicarious liability of the State and its agencies for its officials and employees. The paucity of guidance, both in West Virginia and other jurisdictions, is occasioned almost entirely by the fact most other jurisdictions have enacted some form of tort claims act which governs actions against the state and its agencies. In West Virginia, however, the Governmental Tort Claims and Insurance Reform Act, West Virginia Code § 29-12A-1 *et seq.*, is limited to political subdivisions and their employees and does not cover claims made against the State or its agencies. W. Va. Code § 29-12A-3(c) and (e); *see also Hess v. W. Va. Div. of Corr.*, 227 W. Va. 15, 705 S.E.2d 125 (2010).

As one commentator noted many years ago,

the relationship between governmental and officer liability remains to a large extent ill-defined. The failure of legislatures to resolve many of the problems that flow from the coexistence of these two bodies of law has had the effect both of transferring basic policy decisions to the courts and of greatly complicating governmental tort claims litigation. Furthermore, if there is any substance to the notion that the prospect of personal liability instills an unhealthy insecurity in public officials, uncertainty over the relationship between governmental and officer liability probably only aggravates the situation.

9

George A. Bermann, *Integrating Governmental and Officer Tort Liability*, 77 Colum. L. Rev. 1175, 1213 (1977).[9] Unfortunately, at least in West Virginia, little has transpired in the intervening thirty-seven years to better define this relationship in absence of a statutory tort claims act applicable to the State, its agencies, officials, and employees. In most instances where immunity was addressed, where both the State and an individual officer or employee were named defendants, this Court has simply ruled on the more central issue of whether the complained of conduct underlying the case warranted immunity and treated individual defendants and their employers collectively, without separate analysis of whether the State or State agency is necessarily entitled to like treatment and why. *See, e.g., State v. Chase Securities, Inc.,* 188 W. Va. 356, 424 S.E.2d 591 (1992); *Clark v. Dunn,* 195 W. Va. 272, 465 S.E.2d 374 (1995); *Jarvis v. W. Va. State Police*, 227 W. Va. 472, 711 S.E.2d 542 (2010).

## 2.    *The Evolution of Immunity in West Virginia*

In absence of any action by our Legislature to enact a statutory scheme which would outline the scope of the State's liability in tort, we are left to examine the state of our law with respect to the immunity of the State, its agencies, officials, and

---

[9] Professor Bermann's law review article is quoted liberally throughout this opinion and represents a particularly thorough treatment of this subject, more recent discussion of which has been largely obviated by the passage of statutory tort claims acts throughout the country.  In fact, this article was commended for use in further development of the principles herein by the Court in *Parkulo*:  "A guideline for use in the case-by-case approach to the problem of the interplay of governmental and public officer personal tort liability . . . has been well-stated in [Professor Bermann's] article[.]"  199 W. Va. at 178 n.14, 483 S.E.2d at 524 n.14.

10

employees, as well as the policy implications attendant to governmental immunity, in an attempt to formulate a workable rule for State-level governmental and employee immunities.[10] It is clear that relegating these issues to the lower courts to decide on a "case-by-case" basis as instructed in *Parkulo* has compelled practitioners and the lower courts to indiscriminately borrow phrases from what this Court has described as a "patchwork of holdings" to cobble together an applicable rule. *W. Va. Dept. of Health and Human Resources v. Payne,* 231 W. Va. 563, ___, 746 S.E.2d 554, 562 (2013).

As Professor Bermann noted, "[b]ecause the doctrines of sovereign and officer immunity spring from distinct, if related, concerns, each has evolved independently." Bermann, *supra* at 1181. This independent evolution has unquestionably occurred in West Virginia, as evidenced by the following brief history. Our modern immunity law began to take a more clearly identifiable form in 1992 with *State v. Chase Securities, Inc.*, 188 W. Va. 356, 424 S.E.2d 591. In *Chase Securities*, this Court noted that "our law with regard to public official immunity is meager," 188 W. Va. at 358, 424 S.E.2d at 593, and borrowed from federal public official immunity caselaw[11]

---

[10] Without question, "the task of balancing the interests relevant to governmental tort litigation is legislative in character." Bermann, *supra* at 1189. Nearly twenty-two years ago, Justice Miller first raised the specter of legislative enactment which would obviate the necessity for such issues to be foisted upon this Court by the Legislature's silence. *See Chase Securities,* 188 W. Va. at 365 n.28, 424 S.E.2d at 600 n.28.

[11] This Court has encouraged the use of federal precedent to guide our immunity analysis because "it would seem appropriate to construct, if possible, an immunity standard that would not conflict with the federal standard." *Chase Securities*, 188 W. Va. (continued . . .)

to craft the following syllabus point regarding the immunity of a public official "acting within the scope of his authority":

> A public executive official who is acting within the scope of his authority and is not covered by the provisions of W. Va. Code, 29-12A-1, *et seq.* is entitled to qualified immunity from personal liability for official acts if the involved conduct did not violate clearly established laws of which a reasonable official would have known. There is no immunity for an executive official whose acts are fraudulent, malicious, or otherwise oppressive. . . .

Syllabus, in part, *Chase Securities.* This standard was thereafter extended to cover the discretionary judgments of "rank-and-file" employees in 1995 in *Clark v. Dunn*, 195 W. Va. 272, 465 S.E.2d 374.[12] In *Clark*, plaintiff brought a negligence action against the

---

at 360, 424 S.E.2d at 595. Unfortunately, however, with respect to the interplay between the immunity of the State and its public official and employees, federal caselaw provides little assistance for several reasons. Factually similar cases addressing immunity found in federal caselaw are cases brought pursuant to 42 U.S.C. § 1983, which actions do not lie against the State. *See Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71 (1989) ("[N]either a state nor its officials acting in their official capacities are 'persons' under § 1983."). Further, attempting to draw analogies between the contours of actionable claims pursuant to § 1983 and those alleged herein are inadequate since § 1983 jurisprudence is constrained by the federal courts' interpretation of the language of § 1983 itself. Nothing herein serves to supplant the federal § 1983 jurisprudence regarding immunity or actionable claims thereunder inasmuch as "in Section 1983 litigation a state may not create an immunity for state officials that is greater than the federal immunity." *Chase Securities*, 188 W. Va. at 359, 424 S.E.2d at 594; *see also Hutchison v. City of Huntington,* 198 W.Va. 139, 152 n.17, 479 S.E.2d 649, 662 n.17 (1996) ("[S]tate immunity laws are not applicable to § 1983 actions."); *Howlett v. Rose*, 496 U.S. 356 (1990) (in § 1983 litigation in state courts, a state may not create an immunity greater than the federal immunity).

[12] The Court summarily concluded that "Officer Dunn is properly considered a public *officer*" without discussion as to whether the immunity of the "public *official*" described in *Chase Securities* (which involved the Governor, the Treasurer, and the Auditor—all high-ranking elected officials) perhaps differed in character from the type of (continued . . .)

Department of Natural Resources and a DNR officer, who was found to be "engaged in

the performance of discretionary judgments and actions within the course of his

authorized law enforcement duties." *Id.* at 278, 465 S.E.2d at 380. Noting that the

officer did not violate a "clearly established . . . statutory law or constitutional right[],"

195 W. Va. at 278, 465 S.E.2d at 380, the Court reaffirmed the above syllabus point from

*Chase Securities* and established what is now referred to as the "discretionary function"

immunity:[13]

> If a public officer is either authorized or required, in the
> exercise of his judgment and discretion, to make a decision
> and to perform acts in the making of that decision, and the

---

immunity afforded a rank-and-file employee such as Officer Dunn. *Clark,* 195 W. Va. at 278, 465 S.E.2d at 380 (emphasis added). Our subsequent caselaw likewise has made no such distinction.

[13] This type of immunity is characterized by the Restatement (Second) of Torts as somewhat "derivative" of the executive or administrative immunity: "A public officer acting within the general scope of his authority is not subject to tort liability for an administrative act or omission if [] he is immune because engaged in the exercise of a discretionary function[.]" § 895D. However, in West Virginia, the type of immunity afforded by the discretionary acts immunity, which is a *qualified* immunity, should not be conceptually commingled with the executive/administrative act immunity for policy-making acts which is *absolute*. Syl. Pt. 7, *Parkulo*, 199 W. Va. 161, 483 S.E.2d 507.

This is the trap into which respondent and the circuit court fell as evidenced by their rejection of WVRJCFA's "discretionary acts" immunity argument by concluding that training, supervision, and retention were not acts which involved the "determination of fundamental governmental policy." It is clear that this Court has established, akin to the federal courts, a distinct immunity for "discretionary" acts or functions of governmental actors from the highest level down to the rank-and-file; it is wholly at odds with the goal of this immunity to require that these discretionary acts must also rise to the level of "policy-making" before such immunity may be invoked. *See, e.g., Clark,* 195 W. Va. 272, 465 S.E.2d 374; *but see Hess*, 227 W. Va. at 20, 705 S.E.2d at 130 (dispensing as premature the issue of whether the acts giving rise to the cause of action arise from "discretionary, administrative policy-making" acts).

13

decision and acts are *within the scope of his duty, authority, and jurisdiction*, he is not liable for negligence or other error in the making of that decision, at the suit of a private individual claiming to have been damaged thereby.

Syl. Pt. 4, *Clark,* 195 W. Va. 272, 465 S.E.2d 374 (emphasis added). Speaking for the first time specifically to the immunity of the State and its agencies, as opposed to merely its public officials, the Court further held:

In the absence of an insurance contract waiving the defense, *the doctrine of qualified or official immunity bars a claim of mere negligence against a State agency* not within the purview of the West Virginia Governmental Tort Claims and Insurance Reform Act, W. Va. Code § 29–12A–1, *et seq.,* and *against an officer of that department acting within the scope of his or her employment, with respect to the discretionary judgments, decisions, and actions of the officer*.

Syl. Pt. 6, *Clark*, 195 W.Va. 272, 465 S.E.2d 374 (emphasis added).


The following year (in our only reported case to discuss in any meaningful fashion the immunity of the State and its agencies), the Court in *Parkulo* set out to recast a "reasoned statement" of the current posture of common law immunities. 199 W. Va. at 175, 483 S.E.2d at 512. This "reasoned statement," albeit well-intentioned and sorely needed, resulted in a wandering, historical overview of immunity that unfortunately has done little to clarify matters. The Court began by reiterating that the State and its public officials are *absolutely* immune with respect to "judicial, legislative, and executive (or administrative) policy-making acts and omissions." Syl. Pts. 6 and 7, in part, *Parkulo*, 199 W. Va. 161, 483 S.E.2d 507. With respect to the immunity of the State and its officials for matters falling outside the scope of judicial, legislative, or executive policy-

14

making acts, the Court "endorsed" the *Chase Securities* rule regarding a public official's personal, qualified immunity for discretionary judgments and functions which are neither in violation of a "clearly established law" nor "fraudulent, malicious, or otherwise oppressive." Syl. Pt. 8, in part, *Parkulo.* As noted above, the *Parkulo* Court then obliquely passed along the "general rule" of the "coterminous" immunity between a public official and the State before allowing its undefined exceptions to quite literally swallow and render meaningless this "rule." *See* Syl. Pt. 9, *Parkulo.*

### 3. *Respondeat Superior and the Immunity of the State*

Turning now to the specific issues presented in the case herein, the WVRJCFA maintains that because any alleged sexual assault by D. H. would fall well outside of the scope of his duties as a correctional officer, the WVRJCFA is entitled to immunity. As previously noted, rather than exploring the issue of the scope of the State's immunity relative to that of its public officials and employees, the parties and lower court relegated this issue to ordinary *respondeat superior* principles. While we reject a blind application of common-law master-servant principles which fail to accommodate the policy interests at play with respect to the immunity of the State and its agencies, we do agree that the issue of whether the public official or employee's actions are within the scope of his duties, authority, or employment has long been a relevant inquiry in our immunity law. As indicated above, beginning in *Chase Securities* and thereafter in *Clark*, this Court has utilized the phrases "scope of authority" and "scope of

15

employment" at least as pertains to the immunity of the public official. Moreover, the Restatement (Second) of Torts § 895D, provides that

> [a] public officer acting within the *general scope of his authority* is immune from tort liability for an act or omission involving the exercise of a judicial or legislative function . . . [or] administrative act or omission if . . . he is . . . engaged in the exercise of a discretionary function . . . .

(emphasis added). Comment g to the Restatement notes that when an officer goes "entirely beyond [the general scope of his official authority] and does an act that is not permitted at all by that duty, he is not acting in his capacity as a public officer or employee and he has no more immunity than a private citizen." *Id.*

The rationale for stripping a public official of his immunity informs the issue of whether the State should likewise lose its immunity for and be vicariously liable for acts of its officials or employees when they act outside of the scope of their authority. Most tort claims acts include not merely exclusions for acts outside of the employee's scope of employment, but many specifically enumerate intentional torts for which the government is expressly immune. Such exclusions are necessary to "reliev[e] the government of liability where its connection to the tort is too remote." Bermann, *supra* at 1186. The rationale behind imposing personal liability upon a public official where his acts are beyond the scope of his authority has been aptly described as follows:

> First, the harm resulting from such conduct is probably more easily avoided than the harm caused by simple negligence and is therefore a poorer candidate for consideration as an ordinary cost of government. Second, if the threat of personal liability serves some deterrent purpose, its imposition would

16

seem particularly useful where willful or wanton misconduct is concerned. *Finally, even if such conduct cannot readily be eliminated, it does not follow that the public should have to pay for its consequences.* On the contrary, retributive justice would seem to demand that public officials answer personally for egregious conduct.

*Id*. at 1197 (emphasis added). We can perceive no public policy which is justifiably advanced by allocating to the citizens of West Virginia the cost of wanton official or employee misconduct by making the State and its agencies vicariously liable for such acts which are found to be manifestly outside of the scope of his authority or employment. Such conduct is notable for being driven by personal motives which in no way benefit the State or the public, nor is it reasonably incident to the official or agent's duties.[14]

Such a conclusion, however, necessarily implies that where a public official or employee's conduct which *properly* gives rise to a cause of action is found to be within the scope of his authority or employment, neither the public official nor the State is entitled to immunity and the State may therefore be liable under the principles of

---

[14] *See* Syl. Pt. 6, *Courtless v. Jolliffe,* 203 W.Va. 258, 507 S.E.2d 136 (1998) ("'An act specifically or impliedly directed by the master, or any conduct which is an ordinary and natural incident or result of that act, is within the scope of the employment.' Syllabus, *Cochran v. Michaels*, 110 W.Va. 127, 157 S.E. 173 (1931)"); *see also Griffith v. George Transfer & Rigging, Inc.,* 157 W.Va. 316, 326, 201 S.E.2d 281, 288 (1973) ("'Scope of employment' is a relative term and requires a consideration of surrounding circumstances including the character of the employment, the nature of the wrongful deed, the time and place of its commission and the *purpose* of the act." (emphasis added)).

17

*respondeat superior.* We find that this approach is consistent with the modern view that "the cost of compensating for many such losses is regarded as an ordinary expense of government to be borne indirectly by all who benefit from the services that government provides." Bermann, *supra* at 1176. Much like the negligent performance of ministerial duties for which the State enjoys no immunity, we believe that situations wherein State actors violate clearly established rights while acting within the scope of their authority and/or employment, are reasonably borne by the State.[15]

In *Dunn v. Rockwell*, 225 W.Va. 43, 62 n.20, 689 S.E.2d 255, 274 n.20 (2009), we noted with approval the policy rationale historically underlying *respondeat superior* liability as stated by the California Supreme Court: "(1) to prevent recurrence of the tortious conduct; (2) to give greater assurance of compensation for the victim; and (3) to ensure that the victim's losses will be equitably borne by those who benefit from the enterprise that gave rise to the injury." (quoting *Mary M. v. City of Los Angeles*, 814 P.2d 1341, 1343 (1991)). The *Mary M.* court observed that

> [t]he doctrine is a departure from the general tort principle
> that liability is based on fault. It is "'a rule of policy, a
> deliberate allocation of a risk[]'" [and] . . . based on "'a
> deeply rooted sentiment'" that it would be unjust for an
> enterprise to disclaim responsibility for injuries occurring in
> the course of its characteristic activities.

---

[15] The mere fact that liability hinges upon the violation of a "clearly established" right does not, in itself, suggest that the acts which give rise to a case are within the realm of "fraudulent, malicious, or oppressive" acts for which a public official loses his immunity. Rather, violations of clearly established rights frequently occur in absence of any ill-intent which might militate against the imposition of vicarious liability.

18

*Id.* (citations omitted). Likewise, with respect to governmental liability, it has been observed that "the government through taxation can more easily distribute such losses among all who benefit from its services." Bermann, *supra* at 1194. Further, "[b]y encouraging higher standards of care in the selection, training, equipment, and supervision of personnel, such a system can have at least as positive an effect on governmental performance as one based upon liability of the individual official." *Id.* at 1195. We find that such policy considerations well-justify extension of liability to the State in such instances. Moreover, we agree that the public interest in ensuring that public officials are "not [] impaired by constant concern about personal liability . . . need not always prevent the attachment of liability to the State." *Parkulo*, 199 W. Va. at 178, 483 S.E.2d at 524. As further noted by the Restatement (Second) of Torts: "With respect to some government functions, the threat of individual liability would have a devastating effect, while the threat of governmental liability would not significantly impair performance." § 895D cmt. j.

### 4. *Reconciliation of Existing Immunity Principles to Determine Coextensiveness of Immunity*

We therefore take this opportunity to harmonize our existing syllabus points with respect to the immunity of the State, its agencies, officials and employees, and further elaborate on the procedural analysis required to determine whether immunity flows to an individual employee or official defendant, the State and its agencies, neither,

19

or both.  To determine whether the State, its agencies, officials, and/or employees are entitled to immunity, a reviewing court must first identify the nature of the governmental acts or omissions which give rise to the suit for purposes of determining whether such acts or omissions constitute legislative, judicial, executive or administrative policy-making acts or otherwise involve discretionary governmental functions.  This critical first step may be evident from the nature of the allegations themselves or may be effectively accomplished by identifying the official or employee whose acts or omissions give rise to the cause of action.  This individual identification may more easily permit a proper examination of that particular official or employee's duties and responsibilities and any statutes, regulations, or other "clearly established" laws which are applicable to his or her duties.  This approach is compelled by the well-settled precept that "[g]overnmental entities can act only through their officers, agents, and employees."  57 Am. Jur. 2d Municipal, County, School, and State Tort Liability § 145.

> We recognize, however, that
>
> some losses occasioned by governmental activity may not be traceable to any particular official.  For example, legislation may impose duties upon the government that the latter simply fails to implement. . . . More generally, however, a governmental operation may suffer from inefficiency, delay or other systemic disorders that cannot be laid at the feet of any particular official yet still cause injury that warrants compensation.

Bermann, *supra* at 1187.   Moreover, "duties or obligations may be placed on the government that are not imposed on the officer, and statutes sometime make the

government liable when its employees are immune." *Parkulo,* 199 W. Va. at 177, 483 S.E.2d at 523 (quoting Restatement (Second) of Torts 2d § 895D, cmt. j, in part (1979)). More importantly, however, "immunity is justified and defined by the *functions* it protects and serves, not by the person to whom it attaches." *Forrester v. White*, 484 U.S. 219, 227 (1988). As such, identifying a particular official or employee whose actions give rise to a cause of action is necessary only to the extent needed to guide the lower court's analysis of whether the complained of actions are legislative, judicial, executive or administrative policy-making acts, or otherwise discretionary governmental functions. To the extent that the cause of action arises from judicial, legislative, executive or administrative policy-making acts or omissions, both the State and the official involved are absolutely immune pursuant to Syl. Pt. 7 of *Parkulo v. W. Va. Bd. of Probation and Parole*, 199 W. Va. 161, 483 S.E.2d 507 (1996).

However, to the extent that governmental acts or omissions which give rise to a cause of action fall within the category of discretionary functions, a reviewing court must further determine whether the plaintiff has demonstrated that such acts or omissions are in violation of clearly established statutory or constitutional rights or laws of which a reasonable person would have known or are otherwise fraudulent, malicious, or oppressive in accordance with *State v. Chase Securities, Inc.*, 188 W. Va. 356, 424 S.E.2d 591 (1992). In absence of such a showing, both the State and its officials or employees charged with such acts or omissions are immune from liability. If the plaintiff identifies a clearly established right or law which has been violated by the acts or

21

omissions of the State, its agencies, officials, or employees, or can otherwise identify fraudulent, malicious, or oppressive acts committed by such official or employee, the court must then determine whether such acts or omissions were within the scope of the public official or employee's duties, authority, and/or employment. Such determination may or may not turn on disputed issues of material fact. In the event of a genuine dispute of material fact the court may submit for resolution by a jury the issue of whether the State actor was in fact within the scope of his duty, authority, and employment when committing the acts which give rise to the case in accord with our admonitions in *Hutchison*. *See* Syl. Pt. 1, in part, *Hutchison*, 198 W. Va. 139, 479 S.E.2d 649 (holding that immunity is ripe for summary disposition except where there is a "bona fide dispute as to the foundational or historical facts that underlie the immunity determination").

To the extent that such official or employee is determined to have been acting outside of the scope of his duties, authority, and/or employment, the State and/or its agencies are immune from liability, but the public employee or official is not entitled to immunity in accordance with *State v. Chase Securities, Inc.*, 188 W. Va. 356, 424 S.E.2d 591 (1992) and its progeny. If the public official or employee was acting within the scope of his duties, authority, and/or employment, the State and/or its agencies may be held liable for such acts or omissions under the doctrine of *respondeat superior,* along with the public official or employee. We observe that our holdings today in no way represent a seismic shift in this Court's handling of governmental immunities, but rather, reflect a clarification and elaboration on the scope of the State's immunity *vis-a-vis* its

officials and employees, as reflected in our precedent and long-standing public policy concerns. [16]

## 5.  *Application of Immunity Paradigm to Case Sub Judice*

Turning now to the application of the foregoing to the facts of this particular case, we find that D. H.'s general functions as a correctional officer, like most law enforcement officers, are *broadly* characterized as discretionary, requiring the use of his discretionary judgments and decisions.  Having made that determination, however, it is undisputed that D. H. is alleged to have violated a clearly established law, West Virginia Code § 61-8B-10(a), leaving us only to determine whether he was acting within the general scope of his authority and employment.  As noted above, while fact questions may on occasion preclude summary determination of this prong, we find that D. H.'s alleged acts fall manifestly outside the scope of his authority and duties as a correctional officer.  There can be no question that these acts, as alleged, are in no way an "ordinary and natural incident" of the duties with which he was charged by the WVRJCFA.  Respondent has failed to adduce any evidence bringing these alleged acts within the

---

[16] Nor do our holdings expressly affect the liability of the State, its agencies, officials, and employees for actions based upon breach of so-called "ministerial" duties, which have been historically exempted from the realm of governmental functions for which the State, its officials, and employees are entitled to immunity.  *See Clark*, 195 W. Va. at 278 n.2, 465 S.E.2d at 380 n.2 ("This opinion does not address causes of action arising out of ministerial functions of government agencies or officers.").  However, in *Payne*, we recognized and agreed with the observation of the *Chase Securities* Court that application of the "clearly established law" principle "will ordinarily have the same effect as the invocation of the 'ministerial acts' principle."  231 W. Va. at __ n.26, 746 S.E.2d at 565 n.26 (citing *Chase Securities*, 188 W. Va. at 364, 424 S.E.2d at 599).

23

ambit of his employment beyond merely suggesting that his job gave him the opportunity to commit them. As such, we conclude that the WVRJCFA is entitled to immunity for respondent's claims based on vicarious liability for D. H.'s acts.

**B.**

***Negligent Training, Supervision, and Retention***

With the foregoing framework in mind, we turn now to the WVRJCFA's claim of immunity for respondent's negligent training, supervision, and retention allegations. The WVRJCFA contends that training, supervision, and retention are inherently discretionary acts for which the State enjoys immunity and that respondent has failed to identify a "clearly established" right or law which the WVRJCFA violated in its supervision, training, and retention of D. H. Respondent counters that if employee training, supervision, and retention are found to be discretionary functions, then the State will have a *de facto* absolute immunity from suit. Respondent further argues that West Virginia expressly recognizes a claim of negligent hiring/supervision/retention against a State agency.

We begin by observing that it is of no consequence to our analysis that the parties characterize this as a "direct" claim against the WVRJCFA; in fact, this claim too is based on vicarious liability despite the absence of specifically named "bad actor(s)" who allegedly negligently supervised, trained, and retained D. H. *See* n.2, *supra.* This claim does not present a scenario where some general duty was statutorily or otherwise

24

imposed upon the State[17] or where the negligence alleged in the complaint cannot be traced to a particular individual(s). The training, supervision, and retention of D. H. unquestionably fell to some public officer(s) or employee(s), from whose alleged negligence respondent's claim derives. However, since respondent did not name a specific individual defendant with respect to this claim, we are faced only with the issue of whether immunity bars such a claim against the State in accordance with the principles previously and herein enunciated.

Having clarified that this claim likewise derives from the alleged negligence of some public officer(s) or employee(s) responsible for the training, supervision, and retention of D. H., we are again guided by the principle first enunciated in *Clark*:

> If a public officer is either authorized or required, in the exercise of his judgment and discretion, to make a decision and to perform acts in the making of that decision, and the decision and acts are within the scope of his duty, authority, and jurisdiction, he is not liable for negligence or other error in the making of that decision, at the suit of a private individual claiming to have been damaged thereby.

---

[17] This is potentially the basis for a scenario where a public official or employee may enjoy immunity, but the State would not—the sole configuration not otherwise developed and analyzed herein. Given the clarification which we endeavor to provide herein, we are loathe to leave this aspect of the public official/governmental immunity paradigm untouched; however, such a scenario has seldom presented itself before this Court and we resign ourselves to review of that issue at a later date.

Syl. Pt. 4, *Clark,* 195 W. Va. 272, 465 S.E.2d 374. More specifically as pertains to the immunity of the State or its agencies for negligence of its public officers and as placed into proper context above:

> In the absence of an insurance contract waiving the defense, the *doctrine of qualified or official immunity bars a claim of mere negligence against a State agency* not within the purview of the West Virginia Governmental Tort Claims and Insurance Reform Act, W. Va. Code § 29–12A–1, *et seq.*, and against an officer of that department acting within the scope of his or her employment, *with respect to the discretionary judgments, decisions, and actions of the officer.*

Syl. Pt. 6, *Id.* (emphasis added). However, as this Court noted last year in *Payne* and as we have clarified herein:

> [O]nce the "judgments, decisions, and actions" of a governmental official are determined to be discretionary, the analysis does not end. Rather, even if the complained-of actions fall within the discretionary functions of an agency or an official's duty, they are not immune if the discretionary actions violate "clearly established laws of which a reasonable official would have known[.]"

231 W.Va. at ___, 746 S.E.2d at 563 (citing Syl. Pt. 3, *Clark*, 195 W. Va. 272, 465 S.E.2d 374).

In *Payne*, we noted further that "certain governmental actions or functions may involve both discretionary and non-discretionary or ministerial aspects, the latter of which may constitute a 'clearly established law of which a reasonable public official would have known.'" *Id.* at ___ n.26, 746 S.E.2d at 565 n.26. For instance, a broadly-characterized governmental action or function may fall under the umbrella of a

"discretionary" function; but within this discretionary function there are nonetheless particular laws, rights, statutes, or regulations which impose ministerial duties on the official charged with these functions. We believe that the broad categories of training, supervision, and employee retention, as characterized by respondent, easily fall within the category of "discretionary" governmental functions. *Accord Stiebitz v. Mahoney*, 134 A.2d 71, 73 (Conn. 1957) (the duties of hiring and suspending individuals require "the use of a sound discretion"); *McIntosh v. Becker,* 314 N.W.2d 728, 729 (Mich. App. 1981) (school board immune for negligent hiring and supervision); *Gleason v. Metro. Council Transit Operations,* 563 N.W.2d 309, 320 (Minn. Ct. App. 1997) (claims for negligent supervision, hiring, training and retention are immune as discretionary acts); *Doe v. Jefferson Area Local Sch. Dist.*, 646 N.E.2d 187 (Oh. Ct. App. 1994) (school board is immune from negligent hiring and supervision claims); *Dovalina v. Nuno,* 48 S.W.3d 279, 282 (Tex. App. 2001) (hiring, training, and supervision discretionary acts); *Uinta Cnty. v. Pennington*, 286 P.3d 138, 145 (Wyo. 2012) ("hiring, training, and supervision of employees involve the policy judgments protected by the discretionary requirement").[18]

---

[18] A number of federal courts are likewise in accord that hiring, training, supervision, and retention are discretionary acts. *See Doe v. Holy See,* 557 F.3d 1066, 1084 (9th Cir. 2009); *Sydnes v. United States*, 523 F.3d 1179, 1186 (10th Cir. 2008); *Bolduc v. United States,* 402 F.3d 50, 61 (1st Cir. 2005); *Vickers v. United States,* 228 F.3d 944, 950 (9th Cir. 2000); *Nurse v. United States,* 226 F.3d 996 (9th Cir. 2000); *Burkhart v. Wash. Metro. Area Transit Auth.,* 112 F.3d 1207, 1216–17 (D.C. Cir. 1997); *Tonelli v. United States*, 60 F.3d 492, 496 (8th Cir. 1995); *Gordon v. Ottumwa Comm.* (continued . . .)

Moreover, we disagree with respondent that this Court has previously held that negligent hiring, supervision, and retention claims are *per se* viable causes of action against the State or its agencies. In the cases relied upon by respondent, *State ex rel. W. Va. State Police v. Taylor,* 201 W. Va. 554, 499 S.E.2d 283 (1997) and *McCormick v. W. Va. Dep't of Pub. Safety*, 202 W. Va. 189, 503 S.E.2d 502 (1998), the negligent hiring, supervision, and retention claims were asserted against *private* entities who were also parties to the litigation and *not* the State agency named in the suit.[19]

However, as explained more fully above, the conclusion that employee training, supervision, and retention are discretionary governmental functions is not necessarily fatal to respondent's claim. To the extent that she can nonetheless demonstrate that the WVRJCFA violated a "clearly established" right or law with respect to its training, supervision, or retention of D. H., the WVRJCFA is not entitled to

---

*Sch. Dist.*, 115 F. Supp.2d 1077, 1088 (S.D. Iowa 2000); *Hughes v. City of Hartford,* 96 F. Supp.2d 114, 119 (D. Conn. 2000); *Jackson v. Katy Ind. Sch. Dist.,* 951 F. Supp. 1293, 1306 (S.D. Tex. 1996); *Newsome v. Webster,* 843 F. Supp. 1460, 1468 (S.D. Ga. 1994).

[19] We likewise find the West Virginia federal court cases cited by respondent in support of this proposition inapposite inasmuch as they were filed against political subdivisions, the liability of which is governed by the West Virginia Tort Claims and Insurance Reform Act. *See, e.g. Woods v. Town of Danville, W. Va.*, 712 F. Supp.2d 502 (S.D.W. Va. 2010); *Gilco v. Logan Cnty. Comm'n,* No. 2:11-0032, 2012 WL 3580056 (S.D.W. Va. Aug. 17, 2012).

immunity.[20] In an effort to identify such a law, respondent contends that the WVRJCFA violated the PREA; the WVRJCFA, however, claims that the PREA was not in effect at the time of the alleged incidents underlying this action.

The PREA became effective September 4, 2003; as such, it appears that the WVRJCFA is actually asserting that the "national standards" to be developed by the Commission created under the PREA were not yet in effect. 42 U.S.C. § 15607 ("Adoption and effect of national standards"). The final rule was published in the federal register on June 20, 2012, and became effective on August 20, 2012. 77 Fed. Reg. 37106-01 (June 20, 2012) (to be codified at 28 C.F.R. pt. 115). Certain standards do not go into effect until a later date. The acts alleged in the underlying suit occurred in 2009 through 2010. We find, however, that the PREA merely "authorizes grant money, and creates a commission to study the [prison rape] issue. . . . The statute does not grant prisoners any specific rights." *De'Lonta v. Clarke*, No. 7:11-cv-00483, 2013 WL 209489, at *3 (W.D. Va. Jan. 14, 2013) (quoting *Chinnici v. Edwards*, No. 1:07-cv-229, 2008 WL 3851294, at *3 (D. Vt. Aug. 13, 2008). As such, neither the PREA, nor the standards promulgated at its direction, provide respondent with a "clearly established right" sufficient to strip the WVRJCFA of its immunity.

---

[20] The WVRJCFA does not claim that any such alleged negligence with respect to training, supervision, or retention would fall outside of the scope of the authority of any official or employee charged with such responsibilities.

29

There are, nevertheless, existing state regulations which govern certain aspects of the training, supervision, and retention of jail employees as set forth in the "West Virginia Minimum Standards for Construction, Operation, and Maintenance of Jails", West Virginia C.S.R. § 95-1-1 *et seq.* In the instant case, however, respondent has failed to identify a single regulation which the WVRJCFA has violated as pertains to training, supervision, or retention.[21] Moreover, respondent voluntarily dismissed her West Virginia constitutional claims and expressly exempted the WVRJCFA from the scope of the United States constitutional claims alleged in her complaint. Respondent's case suffers from the same fundamental flaw as did the case in *Payne*: "[A]t no time do respondents identify a specific law, statute, or regulation which the DHHR defendants violated." 221 W. Va. at __, 746 S.E.2d at 565. As such, we find that respondent's failure to identify a "clearly established" right which the WVRJCFA violated through its training, supervision, and retention of D. H. is likewise fatal to her claim.

---

[21] In her briefing before this Court in a further attempt to identify a "clearly established law," respondent argues that the WVRJCFA was obliged and failed to conduct an annual psychological examination of D. H., pursuant to *Harrah v. Leverette*, 165 W. Va. 665, 271 S.E.2d 322 (1980). Prior to the creation of the Regional Jail and Correctional Facility Authority, the Court in *Harrah* held that annual psychological testing was required for corrections officers within the Division of Corrections. 165 W. Va. at 681, 271 S.E.2d at 332.

However, West Virginia Code of State Regulations § 95-1-4.2, effective June 3, 1996, provides that psychological testing is only required prior to employment and "when a justifiable need exists during their employment." This Court has held that "[a] regulation that is proposed by an agency and approved by the Legislature is a 'legislative rule' as defined by the State Administrative Procedures Act, *W. Va. Code*, 29A–1–2(d) [1982], and such a legislative rule has the force and effect of law." Syl. Pt. 5, *Smith v. West Virginia Human Rights Comm'n.*, 216 W.Va. 2, 602 S.E.2d 445 (2004).

## C.

### *Respondent's "Special Relationship" with the WVRJCFA*

Before dispensing with this matter altogether, we pause briefly to address respondent's contention that, as an inmate at a correctional facility, respondent was owed a "special duty" by the State entitling her to escape the immunity shield of the WVRJCFA. Respondent haphazardly tosses around the phrase "special duty" in an attempt to bolster her claim of the WVRJCFA's negligence, without ever stopping to place the concept into its proper context. This failure has resulted in an error we have had repeated occasion to mention in our immunity cases which involve the related issue of the "public duty doctrine." In sum, the "special relationship" or "special duty" doctrine is an exception to the liability defense known as the public duty doctrine*; it is neither an immunity concept, nor a stand-alone basis of liability*. We have made plain that,

> [q]ualified immunity is, quite simply, immunity from suit. The public duty doctrine is a defense to negligence-based liability, i.e. an absence of duty. *See Holsten v. Massey*, 200 W. Va. 775, 782, 490 S.E.2d 864, 871 (1997) ("The public duty doctrine, however, is not based on immunity from existing liability. Instead, it is based on the absence of duty in the first instance."). This Court dedicated an extensive discussion to the similarities, yet fundamental difference, between the two concepts in *Parkulo v. West Virginia Bd. Of Probation and Parole*, 199 W. Va. 161, 172, 483 S.E.2d 507, 518 (1996): "[The public duty doctrine] is not a theory of governmental immunity, 'although in practice it achieves much the same result'" (quoting Syl. Pt. 1, *Benson v. Kutsch*, 181 W. Va. 1, 380 S.E.2d 36 (1989). Although both defenses are frequently raised, as in this case, only qualified immunity,

31

> if disposed of by way of summary judgment, is subject to
> interlocutory appeal. All other issues are reviewable only
> after they are subject to a final order[.]

*Payne*, 231 W. Va. at __ n.10, 746 S.E.2d at 559-60 n.10; *see also Jones v. Wilcox*, 476 N.W.2d 473, 476 (Mich. Ct. App. 1991) ("The public duty doctrine is premised on the existence of an element of a cause of action for negligence. On the other hand, the governmental immunity issue concerns the creation of exceptions to liability based on the functions of a governmental actor."). As in *Payne*, the attempt to invoke the special duty exception to the public duty doctrine in this interlocutory appeal is improper inasmuch as only the immunity issue is before this Court. Moreover, there is no suggestion whatsoever in the underlying allegations that the WVRJCFA is asserting the public duty doctrine as a defense to liability, to which respondent could then properly invoke the special duty exception. This is likely because respondent has alleged no breach of a duty to the general public such as to give rise to a public duty doctrine defense.[22]

---

[22] To the extent, however, that respondent is attempting to use the "special duty" concept to evade the scope of immunity by suggesting that she is owed a heightened duty of care by virtue of her placement in a correctional facility, we find it unnecessary to carve out an exception for prison inmates and create a special rule of liability for them. While respondent is correct that she stands in a different relation to the State as a confined inmate, to whatever extent she is entitled to different or "heightened" standards of care, such standards exist in countless forms not the least of which are the United States and West Virginia Constitutional prohibitions against cruel and unusual punishment and the plentiful administrative regulations governing correctional facilities. As noted before, respondent has established no violation of any clearly established law and expressly dismissed her West Virginia constitutional claims as against the WVRJCFA.

Accordingly, we find that the WVRJCFA is entitled to immunity for respondent's claims of negligent training, supervision, and retention, and therefore, the circuit court erred in failing to grant summary judgment to the WVRJCFA.

## IV. CONCLUSION

For the foregoing reasons, the December 3, 2012, order denying summary judgment is reversed, and we remand for the entry of an order granting the WVRJCFA's motion for summary judgment and dismissing the action against it.

Reversed and remanded.

33